FRANK WOOD and ELEANOR WOOD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wood v. Commissioner
Docket No. 24658-84.
United States Tax Court
T.C. Memo 1989-263; 1989 Tax Ct. Memo LEXIS 263; 57 T.C.M. (CCH) 565; T.C.M. (RIA) 89263; May 31, 1989. Charles E. Starkey, for the petitioners. Robert A. Stern and Frank Agostino, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By statutory notice of deficiency dated April 12, 1984, respondent determined deficiencies in petitioners' joint Federal income tax for taxable year 1980 in the amount of $ 29,099.84 *264 and an addition to tax pursuant to section 6653(b) [1] in the amount of $ 14,549.92. [2]
The issues for our consideration are: (1) whether petitioners had unreported income in taxable year 1980; (2) if so, whether any portion of the deficiency was attributable to fraud; and (3) whether petitioner Eleanor Wood is an innocent spouse within the meaning of section 6013(e). FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulated facts and the attached exhibits are incorporated herein by this reference. Petitioners Frank and Eleanor Wood, husband and wife, resided in Farmingdale, New Jersey, at the time of filing the petition herein. For taxable year 1980, petitioners timely filed a Federal income tax return and, subsequently, an amended *265 return with the Internal Revenue Service Center in Holtsville, New York. During the years 1977 through 1980, petitioner Frank Wood (petitioner) operated a sole proprietorship, Norwood Company (Norwood), which provided labor to cut and thread stainless steel pipe fittings and nipples for Virginia Stainless Steel Nipple Corporation (VSSN), a manufacturer of stainless steel pipe fittings and nipples. VSSN then sold the finished pipe fittings and nipples primarily to McCormick & Wood of Linden, Inc. (MWL), a distributorship of stainless steel pipe, valves, pipe fittings and nipples, which then sold the merchandise to retailers. Both MWL and VSSN were operated by Wesley W. Wood, petitioner's father, who was the sole shareholder in MWL and owned 1,950 shares of VSSN. Petitioner owned the remaining 50 shares of VSSN and served as the vice-president of MWL and the chief operating officer and manager of both MWL and VSSN. MWL, VSSN and Norwood all operated out of the same warehouse and office facility. Petitioner's duties at MWL and VSSN included managing the shop and warehouse, taking orders over the phone and supervising the filling and shipping of orders. Prior to 1977, petitioner's *266 brother, Robert J. Wood (Bobby Wood), was the sales manager for MWL and usually worked outside of the office selling to and visiting customers. Wesley Wood, the president of MWL and VSSN, reviewed the daily orders and billing and supervised the entire operation, although he was away from the office frequently during 1977 and 1978 because his wife was very sick. While his father was away petitioner was completely in charge. MWL employed a bookkeeper, Ellen Donahue, who was responsible for record keeping, payroll, maintaining the internal books, assisting with tax return preparation and supervising billing for MWL, VSSN and Norwood. Simon Mass (Mass) and Hannan Epstein (Epstein), who were certified public accountants licensed in the State of New Jersey, reviewed and balanced the internal books of all three companies monthly and reviewed the taking of an annual inventory. Mass also prepared the 1980 tax returns for VSSN, MWL and Wesley. Petitioners' 1980 tax return was prepared by Epstein because Mass refused to compute Norwood's income without reference to VSSN's books and records. Petitioner maintained a checking account for Norwood, and a joint checking account for himself and *267 his wife. From 1977 through 1980, VSSN paid Norwood for labor provided. Petitioner would cash the check and use part of the proceeds to pay Norwood's employees. Petitioner deposited the remainder of the cash into either Norwood's or his own bank account. Checks issued to Norwood were frequently deposited in petitioner's personal account, and checks issued to petitioner often wound up in Norwood's account. Checks on Norwood's account were occasionally issued to pay for petitioner's personal expenses, and petitioner sometimes personally paid Norwood's expenses. To provide for his children's futures Wesley Wood assisted Bobby Wood and petitioner in forming McCormick & Wood of Virginia (MWV), a pipe fitting distributorship business in Chester, Virginia, in 1977. Bobby Wood went to Virginia to manage the new business while petitioner remained in New Jersey. Several of MWL's larger customers had opened plants in Virginia and Maryland, so Bobby Wood already had customer contacts when he opened up MWV. Occasionally MWV employees would call petitioner in New Jersey for assistance if Bobby Wood was unavailable, otherwise petitioner did no work for MWV. At some time during 1978 or *268 1979, Wesley Wood conveyed the stock in MWV equally to Bobby Wood and petitioner. Bobby Wood served as MWV's president and petitioner as its vice-president. The land and building used by MWV was rented from WBW Realty Corporation, a corporation organized and owned by Wesley Wood and later transferred to his two daughters. For its first year of business all of MWV's books and billing were handled by MWL. Orders that came in to MWV were quickly placed with MWL, which filled and shipped the orders back to MWV. MWL then sent out the bills and forwarded payment to MWV. MWL gave MWV an initial start up inventory on consignment. As MWV began to manufacture pipe fittings and nipples it was to repay MWL in cash or in similar merchandise for the goods received on consignment. Additionally, MWL guaranteed a line of credit for MWV during the first year of business. In response to Bobby Wood's increasing demands for independence MWV's books and records were separated from MWL's books and sent to Virginia in May of 1979. To settle the accounts, MWL charged MWV between $ 4,000 and $ 5,000 for deliveries of inventory for which MWV had not yet paid. After the death of his wife in 1979, *269 Wesley Wood turned his full attention once more to the business and discovered a filing drawer containing unbilled invoices to MWV for shipped merchandise. Wesley Wood believed that his sons had conspired to steal from him and MWL by ordering merchandise for MWV from MWL, selling it to others, retaining the sales proceeds, and never repaying MWL. Wesley Wood brought a suit for conversion against his sons, Bobby Wood and petitioner, demanding $ 442,175.24 in damages. Wesley Wood prevailed and was awarded a judgment of $ 200,540.21 against petitioner, Bobby Wood and MWV. MWV paid the entire judgment when petitioner refused to pay. Because of these difficulties with his father, petitioner left MWL and VSSN in December of 1980. Petitioner dissolved Norwood and in September 1980, MWV organized Virginia Stainless Steel Products Corporation (VSSP), a corporation organized under the laws of the State of New Jersey and owned equally by petitioners. Continuing the combined businesses of Norwood and VSSN, VSSP manufactured stainless steel pipe fittings and nipples. Petitioner was VSSP's chief operating manager while Eleanor Wood was the bookkeeper and office manager. Internal Revenue *270 Agent Gary Stroz (Agent Stroz), who worked with the Criminal Investigative Division, conducted an audit of petitioners' tax years 1977 through 1980. In examining petitioners' records for unreported income, Agent Stroz recomputed petitioner's business income. Rather than only considering the amounts which had been deposited to Norwood's bank account, Agent Stroz and Internal Revenue Agent Salvatore Labella (Agent Labella), added together all the payments made by VSSN to Norwood as indicated by VSSN's books and records. Neither petitioners nor Norwood kept books and records. The sum of all the payments made by VSSN exceeded the amount of income entered on petitioner's Schedule C by $ 22,319.00. Petitioner's Schedule C for 1980 only listed Norwood's income from VSSN. Petitioners reported wages and salary only in the amount petitioner earned from MWL. In November 1980, petitioner received a check for $ 10,000 from MWV payable to Norwood which he deposited in his personal account. On July 9, 1980, MWV issued petitioner a check for $ 3,500 and entered the expenses on its books as a consulting fee. On September 8, 1980 and November 3, 1980, petitioner submitted invoices to MWV for *271 purchases of pipe and received payments by check in the amounts of $ 519.44 and $ 1,038.88, respectively. On April 14, 1980, MWV issued a dividend check to petitioner in the amount of $ 2,000. None of these amounts were included in petitioners' income on their 1980 tax return. On February 1, 1980, petitioner purchased a Corvette automobile with a loan of $ 16,000 which Bobby Wood had obtained for him from the Peoples Bank of Chesterfield. At about the same time, petitioner submitted an invoice to MWV demanding payment for consulting fees in the amount of $ 16,000. On April 3, 1980, MWV paid off the loan with the Peoples Bank of Chesterfield with a check issued to petitioner. Bobby Wood signed petitioner's name, with his permission, to pay off the loan. Petitioner registered the Corvette in his own name and when he traded it in, he did not transmit the sale proceeds to MWV. When MWV opened VSSP in New Jersey as a branch office in 1981 MWV purchased petitioner a Cadillac automobile for business use. Petitioner did not include the payment of the $ 16,000 in income for taxable year 1980. During taxable year 1980, Norwood sold pipe for $ 4,899.82 and $ 3,619.52 to Dason Stainless *272 Products (Dason) and Standard Nipple Works (Standard Nipple), respectively. At the time, both Dason and Standard Nipple were MWL's customers. Norwood was not in the business of selling pipe and had no inventory at the time of the sales. The pipe that was sold was similar to pipe that Wesley Wood claimed was missing from his warehouse. Petitioner did not include the sales receipts from Dason or Standard Nipple in income in 1980. After Agent Stroz' examination, pursuit of a criminal conviction in petitioners' case was not recommended and a statutory notice of deficiency was issued. The determination of deficiency was based on the following amounts of unreported taxable income: Source of Income
Amount
VSSN
$ 22,319.00
MWV
31,058.43
Standard Nipple
3,619.52
Dason
4,899.82
TOTAL
$ 61,896.77
OPINION The first issue for our consideration is whether petitioners failed to report all of their income in taxable year 1980. Section 61(a) requires that gross income include all income from whatever source derived. The burden of proving respondent's determination in error is on petitioners. ; Rule *273 142(a). Petitioner has entirely failed to provide a credible explanation for the amounts of unreported income discovered by Agents Stroz and Labella in their examination. VSSN's books were kept by Ellen Donahue who was a skilled and competent bookkeeper by all accounts. The books for taxable year 1980 unequivocally show payments to Norwood in the aggregate amount of $ 22,319 in excess of the amount of business receipts reported by petitioner. On the other hand, petitioner kept no books and records for himself or Norwood. He had no independent recollection of events to contradict the otherwise inescapable conclusion that all payments made by VSSN to Norwood represented Norwood's business receipts. Petitioner admitted that he frequently intermingled his personal and business funds and can point to no alternative reason for VSSN's transfer of $ 22,319 to Norwood. We conclude that all of VSSN's payments to Norwood constituted taxable income to petitioners. Petitioner received $ 31,058.43 from MWV during taxable year 1980, which he failed to include in reported income. MWV's books and records reflected payments of $ 10,000 on November 20, 1980, and $ 3,500 on July 9, 1980, to *274 petitioner, as well as a repayment of petitioner's $ 16,000 bank loan for the purchase of the Corvette. All of these payments were listed as consulting fees on MWV's books. Although petitioner testified that the payments of $ 10,000 and $ 3,500 were loans, Bobby Wood testified that MWV had never loaned petitioner any money and that MWV never made loans without a formal writing. Petitioner's recollection of the circumstances surrounding the purported loans was tenuous at best, yet he stated that if he had received a loan of $ 10,000 from MWV he would have remembered it. Furthermore, in an interview with Agent Stroz petitioner explained that the payment of $ 3,500 from MWV was to reimburse him for the cost of dental work although he later abandoned this version in favor of the loan story. Similarly, Bobby Wood stated that the Corvette was not a company car but belonged to petitioner. Petitioner's only company car was a Cadillac he received when VSSP was formed to operate in New Jersey. While we are not at all convinced that Bobby Wood's testimony is completely credible, we cannot believe that the payments from MWV to Norwood and petitioner were loans and based on our review of *275 the evidence we conclude that these payments were taxable income to petitioners. According to invoices dated September 8, 1980 and November 3, 1980, MWV made payments to petitioner in the amounts of $ 519.44 and $ 1,038.88. In an interview with Agent Stroz, petitioner said that both of these payments were for purchases of pipe but later characterized them both as personal loans. At the time of the invoices, Norwood did not sell pipe nor own an inventory of pipe. The payments were carried on MWV's books as payments for pipe. Again, outside of petitioner's self-serving testimony, there is no evidence to support the conclusion that these payments were not taxable income to petitioner. On April 14, 1980, MWV issued petitioner a check in the amount of $ 2,000 which was characterized as a dividend on MWV's books. Petitioner stated that he could not remember the reason for the $ 2,000 payment. Although Bobby Wood did not appear to be a completely unbiased witness, petitioner's vague testimony concerning this payment is not worthy of our belief. Respondent also determined that petitioner failed to report payments Norwood received from Dason and Standard Nipple in the aggregate amounts *276 of $ 4,899.82 and $ 3,619.52, respectively. Petitioner explained that he had purchased pipe for cash from salesmen whose names he could not recall at trial. After having his employees cut and thread the pipe, petitioner resold it to Dason and Standard Nipple. In order to purchase on the "open market," petitioner had to pay a premium over the price that MWL or VSSN would have paid for the same pipe, and he sold the finished pipe fittings and nipples below cost. Petitioner explained that the purpose of all of this was to prove to himself that stainless steel nipples could be manufactured profitably because his father refused to tell him whether VSSN was successful. However, between buying at a higher price and selling at a lower price, petitioner discovered that he could not make a profit and decided that he did not have to include the transactions in income. In response to petitioner's strained explanation of the receipts from Dason and Standard Nipple, respondent argues that, in fact, petitioner stole pipe from his father's business, performed the necessary cutting and threading and sold the pipe for his own profit. To support this view, respondent notes that all the other witnesses *277 testified that pipe fittings and nipples were never bought for cash but that sales were always evidenced by invoices. Furthermore, respondent noted that the type of pipe which petitioner claims he bought and sold is the same as the pipe which petitioner stole from Wesley Wood. Respondent's explanation is far more plausible than petitioner's. Petitioner would have us believe that he deliberately paid too much for pipe which he then sold for too little in an effort to demonstrate that he could run the business profitably. This is ludicrous and we do not accept this incredible explanation. Petitioner has failed to, provide even a shadow of a plausible alternative explanation for the various items of unreported income determined by respondent. All petitioner offers to support his story is his uncorroborated self-serving testimony which we are not required to accept. , affg. a Memorandum Opinion of this Court, cert. denied ; (4th Cir.l961), affg. . Faced with books and records *278 from VSSN, MWV, Dason and Standard Nipple which show that petitioner received income in the total amounts determined by respondent we conclude that those determinations are correct. The second and final issue for our consideration is whether petitioners are liable for an addition to tax for fraud pursuant to section 6653(b) for taxable year 1980. Fraud is defined as actual and intentional action motivated for the specific purpose of evading a tax believed to be owing. , affg. a Memorandum opinion of this Court; , affg. a Memorandum opinion of this Court. [3]
The existence of fraud is a question of fact to be determined after a consideration of the entire record. , affd. in an unpublished opinion . Fraud can never be presumed. . Proof of fraud *279 may depend to some extent upon circumstantial evidence and may rest upon reasonable inferences properly drawn from the evidence in the record. . Fraudulent conduct may be inferred from a pattern of conduct. ; . A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See ; (1969. However, the mere failure to report income is not sufficient to establish fraud. , affg. a Memorandum Opinion of this Court. Fraud may also be inferred where the taxpayer makes false and inconsistent statements to revenue agents. . Similarly, understated income, inadequate records, implausible or inconsistent explanations of behavior, concealment *280 of assets and failure to cooperate with tax authorities are all indicia of fraud. , affg. a Memorandum Opinion of this Court. Respondent bears the burden of proving by clear and convincing evidence that some part of an underpayment for taxable year 1980 was attributable to fraud. Sec. 7454(a); Rule 142(b). Although petitioners did not dispute respondent's determinations of underpayments in tax for taxable years 1978 and 1979, the record indicates that petitioner's failure to report all of his income in taxable year 1980 was not an isolated and unprecedented event. Thus, petitioner exhibits a pattern of consistent underreporting. Furthermore, petitioner's account of the events in question have varied widely. During interviews with Agents Stroz and Labella, petitioner indicated that the payments from MWV were personal loans to him or payments for merchandise. However, later, at trial, he could not remember why MWV had made the payments. Petitioner kept no books and records to support his explanation of the source of the funds. Throughout his testimony petitioner' was frequently unable to remember practices *281 and events which he should have known well. In contrast to petitioner's unwillingness or inability to provide a credible explanation for the unreported receipts, respondent has introduced several far more plausible theories. Bobby Wood called the payments consulting fees or dividends and MWV's books also characterized them in that way. Although there appears to be no love lost between any of the members of the Wood family, the record gives no indication that Bobby Wood is biased against petitioner. Petitioner explained that he did occasionally provide consulting services for MWV while he was still working for his father. Similarly, petitioner was a half 16 owner of MWV and it is likely that the payments which were characterized as dividends on MWV's books were actually dividends. Petitioner's explanation of why he had unreported income from Dason and Standard Nipple defies all reason and belief. Petitioner stated that he deliberately lost money, by buying over price and selling below cost, in order to see if he could profitably operate a business similar to VSSN. Although petitioner testified that cash purchases of pipe were common all the other witnesses testified that cash *282 transactions were rare. Petitioner could not produce a single witness to corroborate his story of the frequency of cash purchases and he said that he could not remember the identities of the mysterious pipe sellers whom he did not know well. Finally, petitioner explained that because he did not usually carry much cash he would occasionally purchase pipe on credit. Thus, according to petitioner he was given credit on purchases of pipe by salesmen whom he can no longer remember and did not know well. It is far more likely that the pipe which petitioner sold was stolen from VSSN and MWL and sold to Dason and Standard Nipple. The judgment against petitioner, Bobby Wood and MWV indicates that pipe was indeed stolen and Wesley Wood testified that the stolen pipe was similar to the pipe petitioner sold to Dason and Standard Nipple. While we are certainly aware that Wesley Wood is no longer on good terms with petitioner, we 17 conclude that of the various stories which have been offered to explain petitioner's sales to Dason and Standard Nipple only respondent's version is consistent with the record as a whole and is worthy of our belief. Petitioner makes much of the testimony given *283 by Epstein. Epstein testified that neither petitioner or Bobby Wood ever told him that the payments petitioner received from MWV were not loans. Furthermore, petitioner emphasizes that he never received a Form 1099 from MWV with respect to the dividend of $ 2,000, although he had received an earlier Form 1099 from MWV which caused him to prepare an amended return. However, neither of these arguments negates a finding of fraud. Epstein's ignorance of the true nature of the payments made by MWV to petitioner simply shows that petitioner chose not to inform his accountant of all his sources of income. Thus, in light of the evidence reflected in the record, we conclude that Frank Wood did display a fraudulent intent to evade taxes during the years in issue. However, we recognize that fraud is not imputed from one spouse to the other. Sec. 6653(b)(4); , affd. ; . In order to show fraud on the part of Eleanor Wood, respondent must provide by clear and convincing evidence that she intended to evade taxes which she *284 knew or believed to be owing. . Respondent introduced no evidence that Eleanor Wood had any idea of her husband's practice of diverting corporate receipts to personal uses. While it is likely that she was not completely unaware of his activity, such an inference which has no direct basis in the record, cannot sustain a finding of fraud. Thus, we conclude that Eleanor Wood is not liable for the addition to tax for fraud, although she is jointly and severally liable for the deficiency as determined. The third issue for our consideration is whether Eleanor wood was an innocent spouse within the meaning of section 6013(e) as petitioners averred in the petition. However, the requirements of that section are precise and detailed. Petitioners have offered no evidence to show that Eleanor Wood should be considered an innocent spouse within the meaning of section 6013(e) and we decline to apply that section. Thus, we conclude that respondent's determinations of unreported income for taxable year 1980 are correct and that additions to tax for fraud pursuant to section 6653(b) are sustained against petitioner, *285 Frank Wood. In light of the foregoing. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. By separate notices of deficiency, respondent also determined deficiencies in petitioners' joint Federal income tax for taxable years 1978 and 1979 but petitioners did not dispute those determinations in their petition.↩
3. Petitioner's brief which defines tax fraud as identical to common law fraud misstates the a applicable law.↩